**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

|  |  |  |
|---|---|---|
| | * | |
| **REBECCA LITTLETON,** | * | |
| **Plaintiff** | * | |
| **v.** | * | **CIVIL NO. JKB-17-3164** |
| **STATE OF MARYLAND,** *et al.,* | * | |
| **Defendants.** | * | |

\* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM

Plaintiff Rebecca Littleton brought this action in the Circuit Court for Frederick County against the State of Maryland ("the State"), Frederick County State's Attorney J. Charles Smith III ("Defendant Smith"), and Frederick County Executive Jan Gardner alleging First Amendment retaliation in violation of 42 U.S.C. § 1983, negligence, and breach of contract. (*See* Compl., ECF No. 2.) The Defendants removed the case to this Court, and on November 27, 2017 Plaintiff amended her complaint and substituted Frederick County ("the County") for Ms. Gardner. (*See* Am. Compl., ECF No. 18.) On the same day, Plaintiff moved to excuse notice to the State Treasurer (*see* ECF No. 19). Briefly, the Maryland Tort Claims Act requires those with tort claims against the State to notify the State Treasurer or a designee prior to filing an action in court, but this requirement can be excused on a motion if good cause is shown. *See* Md. Code Ann., State Gov't § 12-101 *et seq.* In response to Plaintiff's amended complaint, the County brought a motion to dismiss (ECF No. 24) and the State brought a motion to dismiss on behalf of itself and Defendant Smith (ECF No. 25). The State responded in opposition to Plaintiff's motion to excuse notice and the time for Plaintiff to reply has expired. Plaintiff responded to

both motions to dismiss and both parties replied. Therefore, the motion to excuse late notice, the County's motion to dismiss, and the State's motion to dismiss are all ripe for review. No hearing is necessary to resolve the matter. *See* Local Rule 105.6 (D. Md. 2016). Plaintiff did not demonstrate good cause for failure to notify the State Treasurer or designee and therefore her motion to excuse late notice will be denied. Plaintiff has failed to state claims against the Defendants, failed to overcome sovereign immunity, and failed to overcome various qualified immunities. For these reasons, explained further below, all but one claim against one Defendant will be dismissed.

## I.    *Background*[1]

In 2014, Plaintiff was working as a Victim Witness Coordinator at the Frederick County State's Attorney's office ("SAO"). (Am. Compl. ¶¶ 9, 11.) That year, she supported "former State's Attorney Rolle" in his campaign for Circuit Court Judge. (*Id.* ¶ 11.) Defendant Smith, the current Frederick County State's Attorney, "chastised" Plaintiff for "expressing her support" for Rolle in the election. (*Id.*)

Soon after being "chastised" Plaintiff sent emails using her work account. (*See* Am. Compl. ¶¶ 11-12.) They covered two topics. First, Plaintiff vented some frustration about how Defendant Smith's religious stance on abortion had affected a child (presumably a victim, and presumably a victim Plaintiff worked with). (*See id.* ¶¶ 11, 34.) The second topic of these emails was a more general frustration with Defendant Smith, including "disparaging comments about Defendant Smith in his capacity as State's Attorney." (*Id.* ¶ 12.) As a result of an "internal investigation unrelated to Plaintiff, Defendant Smith became privy to Plaintiff's email

---

[1] As this memorandum is evaluating a motion to dismiss, the facts are recited here as alleged by Plaintiff, *see Ibarra v. United States*, 120 F.3d 472, 474 (4th Cir. 1997), including those facts set forth in exhibits attached to Plaintiff's original complaint, *see Kensington Volunteer Fire Dep't, Inc. v. Montgomery Cty., Md.*, 684 F.3d 462, 467 (4th Cir. 2012); Local Rule 103.6(b) (2016).

correspondence." (*Id.* ¶ 13.) That is (the Court assumes) Defendant Smith read Plaintiff's emails.

On May 26, 2015, Plaintiff "was invited to a meeting in Defendant Smith's office," where she was shown a letter signed by Defendant Smith ("the May 26 letter"). (Am. Compl. ¶ 14; *see* May 26 Letter, Am. Compl. Ex. A, ECF No. 2-1.) This letter stated the following: Defendant Smith and others were notified by Human Resources of a complaint regarding "improper use of [SAO resources]." (May 26 Letter.) They then conducted an investigation, covering Plaintiff's use of work email and access to various specific databases. (*Id.*) During this investigation, "it was discovered that [Plaintiff] engaged in numerous violations of the Frederick County Technology Use Policy and SAO protocol [including] misuse of information systems; a lack of trustworthiness, and pervasive conduct unbecoming the Office of the State's Attorney and Its employees." The Letter informed Plaintiff that because of these issues, her "at-will employment [was] terminated." (*Id.*)

Plaintiff "vehemently denied the accusations, based primarily on the fact that she lacked any practical access whatsoever to any of the databases listed in Defendant Smith's letter," a state of affairs confirmed by Deputy State's Attorneys who were in the meeting. (Am. Compl. ¶ 15.) Plaintiff does not allege that she denied improperly using SAO resources, that she lacked trustworthiness, or that she engaged in behavior unbecoming of the SAO. Based on Plaintiff's corroborated denial regarding database use, however, Defendant Smith "reconsidered his decision to terminate Plaintiff." (*Id.*) Defendant Smith "also notified Plaintiff for the first time that he had read her 'venting' emails with disparaging statements about him contained therein." (*Id.*)[2]

---

[2] Plaintiff places "venting" in quotes but provides no attribution.

At some point, Defendant Smith "disclos[ed] . . . the true rationale behind Plaintiff's termination." (Am. Compl. ¶ 16.) Considering that Plaintiff has brought a lawsuit regarding her termination, it would have been helpful for Plaintiff to state, explicitly, and in her complaint, what this rationale was. As is, the Court is left to guess that the alleged "true rationale" behind Defendant Smith's decision to fire Plaintiff has something to do with the emails Plaintiff sent, presumably that they contained disparaging remarks about Defendant Smith. Regardless, once Plaintiff knew this "true rationale" she "knew that her employer-employee relationship with [the SAO] had been irreparably harmed." (*Id.*) Defendant Smith then made Plaintiff an offer, which she accepted. (*Id.*) Under the terms of this deal "the SAO agreed to allow Plaintiff to resign her position in consideration of their agreement to provide a good letter of recommendation, sanitize her personnel file of all accusations regarding impropriety, and ensure that no future employers are aware of those inaccurate accusations contained in Defendant Smith's initial termination letter." (*Id.* ¶ 58.)

After this meeting, County Human Resources Director Mitch Hose prepared a document that appears to be a boiler-plate human resources form, cataloging the nature of Plaintiff's departure from the SAO. (Am. Compl. ¶ 17; Hose Document, ECF No. 31-5.)[3] Under "Termination Reasons" the space next to voluntary resignation is checked. It notes that Plaintiff accrued paid leave, and that Plaintiff is not eligible for rehire by the County. On the second page there are some scribbled notes that are largely unintelligible and appear to reference sick and annual leave. After resigning from the SAO, Plaintiff was unable to find work for two months. (Am. Compl. ¶ 18.) She lost her ability to begin collecting her County pension at 52, and now

---

[3] Plaintiff alleges that this document is attached to her amended complaint as Exhibit D, but Exhibit D to her amended complaint is a blank piece of paper, and Exhibit D to her original complaint is a Statement of Reasons regarding Plaintiff's credentialing for her current employer. The Court found this document, upon which Plaintiff's entire claim against the County rests, as Exhibit E attached to Plaintiff's Response to the County's Motion to Dismiss (ECF No. 31-5).

has to wait until the age of 65, and cannot reinvest in the County pension plan. (*See id.* ¶¶ 10, 18.)

Ultimately, Plaintiff was able to find new employment in the Staff Judge Advocate's office on Fort Detrick in Frederick, Maryland. (*See* Am. Compl. ¶¶ 8, 18.). This position required her to "fill[] out a questionnaire" so she could obtain security credentials. (*Id.* ¶ 19.) This questionnaire asked "During the last 5 years . . . did you leave any job by mutual agreement because of specific problems . . . ?" (*Id.*) Plaintiff answered "no." (*Id.*) "During a routine background employment check . . . the State Defendants filled out [a form] indicating that Plaintiff 'resigned after informed of possible discharge.'" (*Id.* ¶ 20.)[4] Additionally, someone sent the May 26 Letter to her current employer. (*See id.*)

In March 2016, after obtaining this information from the SAO, the Department of Defense ("DOD") "issued a Statement of Reasons expressing concerns about Plaintiff's continuing eligibility for . . . credentials." (Am. Compl. ¶ 22.) In June 2016, Defendant Smith sent an email to the DOD, stating that Plaintiff had used her work email for personal business but "did not personally or directly access any other databases or resources, or allow others to use her credentials for such access." (Compl. Ex. E, ECF No. 2-5.)[5]

On November 17, 2016 a hearing was held before an Administrative Law Judge ("ALJ") to determine Plaintiff's eligibility for credentials. (Am. Compl. ¶ 25.) Plaintiff does not allege that any of the Defendants were present, or performed any action at this hearing. DOD counsel did not mention Defendant Smith's June 2016 email, but Plaintiff had a copy. (*Id.* ¶ 26.) Upon learning of this email, the ALJ found that "Plaintiff had potentially misused her work email to conduct personal business, but that this instance of that conduct did not rise to the level of

---

[4] Plaintiff defined The State and Defendant Smith as "collectively, 'State Defendants.'" (Am. Compl. p. 1.)
[5] Plaintiff cites this letter as Exhibit F in her amended complaint. (*See* Am. Compl. ¶ 24.)

affecting Plaintiff's credentials." (*Id.* ¶ 27.) Ultimately, the ALJ "ruled that Plaintiff did not deliberately falsify her declaration for federal employment" and that any improper conduct Plaintiff engaged in in the past should not prevent her from receiving her credentials. (*Id.* ¶ 30.) Plaintiff retained her credentials, and continues to work at Fort Detrick.

Plaintiff brought this action against Defendant Smith, the State, and a Frederick County Executive in the Circuit Court for Frederick County on September 29, 2017, alleging a violation of her First Amendment rights as well as various state law claims. The Defendants removed the case to this Court on October 27, and Plaintiff amended her complaint and substituted the County for the County Executive as a party. Plaintiff brought a motion to excuse her failure to properly notify the State Treasurer in accordance with the Maryland Tort Claims Act, and the State and County have brought motions to dismiss.

## II.    *Standard*

A complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Facial plausibility exists "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678. An inference of a mere possibility of misconduct is not sufficient to support a plausible claim. *Id.* at 679. As the *Twombly* opinion stated, "Factual allegations must be enough to raise a right to relief above the speculative level." 550 U.S. at 555. "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' . . . Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555, 557). Although when considering a motion to dismiss a court must accept as

true all factual allegations in the complaint, this principle does not apply to legal conclusions couched as factual allegations. *Twombly*, 550 U.S. at 555.

### III. *Analysis*

Plaintiff's amended complaint purports to state four causes of action against three Defendants: Frederick County, the State of Maryland, and Defendant Smith. The Court will review the claims against these Defendants in that order.

#### a. *County Liability*

Plaintiff brings two counts against Frederick County: First Amendment retaliation and breach of contract. The Court will dismiss both counts because Plaintiff has failed to allege that the County engaged in any activity involving Plaintiff that can serve as the basis for liability.

The State's Attorney and SAO are creatures of the State, created by Article V, § 7 of the Maryland Constitution. *Valle v. Pressman*, 185 A.2d 368, 374 (Md. 1962); *see also* Md. Code Ann., Gen. Provis. § 5-101 (defining "State official" as, *inter alia*, "a State's Attorney"). For example, when a State's Attorney fires employees for political statements (in opposition to the State's Attorney's candidacy), the employees do not necessarily have recourse against the *county*. *See Runnels v. Newell*, 944 A.2d 1183, 1211-13 (Md. Ct. Spec. App. 2008), *aff'd in part and rev'd in part on other grounds*, *Newell v. Runnels*, 967 A.2d 729 (Md. 2009). The court in *Runnels* explained that the county could be liable only if the employees showed that the State's Attorney was a "policymaker for [the county]" and that he "had final policymaking authority concerning the decision to fire [the employees]." *Id.* at 1211 (citing *McMillian v. Monroe Cty., Alabama*, 520 U.S. 781, 785 (1997)). Counties fund SAOs, and there is much county-related decisionmaking in that regard, but ordinary firing decisions do not involve county policy. *See id.* at 1211-12.

Here, Plaintiff does not allege that Defendant Smith was a policymaker for the County or that he did anything to Plaintiff as part of a County policy. Therefore, nothing that Defendant Smith did towards Plaintiff can serve as the basis for liability against the County. Plaintiff does, however, allege that there is one action the County itself performed, independent of Defendant Smith, that can serve as the foundation for liability. Plaintiff alleges that "County Human Resources Director Mitch Hose . . . ratified" the alleged contract between Defendant Smith and Plaintiff. (Am. Compl. ¶ 17.)

A county can ratify a decision made by a State's Attorney, and thus incur liability. *See Runnells*, 944 A.2d at 1213-15. But the plaintiff must present some facts from which a jury could infer that the county official knew the nature of the decision. *See id.* at 1213. The document signed by Mitch Hose and attached to Plaintiff's complaint is not plausibly a ratification of some nefarious action by Defendant Smith or an agreement between Defendant Smith and Plaintiff. On the first page, it notes that Plaintiff resigned voluntarily, that she accrued paid leave which should be deposited into her account (not a term of the alleged contract), and that she was not eligible for rehire by the County (not a term of the alleged contract). On the second page, the document seems to note that the "action" being recorded is termination ("action" is cut off) and then there are some handwritten and largely illegible notes. These notes seem to refer to accrued sick leave. Plaintiff's signature does not appear on the document. Aside from noting that Plaintiff resigned, it does not demonstrate any knowledge on behalf of Mr. Hose (and therefore, the County) of the conditions of Plaintiff's purported contract with Defendant Smith (e.g. that the "inaccuracies" of the May 26 letter not appear in her personnel file, or that someone prepare a letter of recommendation for her), nor does it demonstrate any knowledge of Defendant Smith's "true rationale" for terminating Plaintiff, the substance of

Plaintiff's emails, or even that Plaintiff was investigated. It is not plausible that this document "ratified" the purported contract between Plaintiff and Defendant Smith.

Plaintiff nowhere alleges any other activity that the County engaged in that could serve as the basis for liability for either a First Amendment retaliation claim or a breach of contract claim. Accordingly, all claims against Frederick County will be dismissed.

### b. *State Liability*

Plaintiff has brought two claims against the State of Maryland: negligence and breach of contract. Both claims will be dismissed because the State is entitled to sovereign immunity, which "prohibits suits against the State [of Maryland] or its entities absent its consent." *Magnetti v. Univ. of Md.*, 937 A.2d 219, 224 (Md. 2007).

### i. *Negligence*

For negligence actions, Maryland has consented to suit only when the Plaintiff complies with the requirements of the Maryland Tort Claims Act ("MTCA"). Md. Code Ann., State Gov't § 12-101 *et seq.* The MTCA requires, as a condition precedent to suit, that a claimant notify the "Treasurer or a designee . . . within 1 year after the injury to person or property that is the basis of the claim." (*Id.*) The Treasurer must then deny the claim, and the action must be filed within 3 years of accrual. *Id.* § 12-106(b)(2) and (3). Only if these conditions are met can the suit go forward. *See Royster v. Gahler*, 154 F. Supp. 3d 206, 217 (D. Md. 2015).

Plaintiff did not comply with these requirements. She states (in her opposition) that she notified the State Treasurer by certified mail on August 27, 2017, and that it was received by September 7, 2017. (Opp'n to State Mot. Dismiss 16; ECF No. 30.) She does not state in her opposition (or amended complaint) *when* her specific injuries occurred, and therefore the Court cannot discern whether this notice was within the 1 year timeframe. (*See id.* at 17 (stating that

she "does not concede that her notice was sent outside the 1-year timeframe" then writing that she "concedes that the first type of injury [loss of salary and pension] occurred on May 26, 2015" (outside the 1-year timeframe) and then writing that "there exist a bevy of possible dates on which those [other] injuries 'occurred'" but does not inform the court on which date they actually did.)  Furthermore, she does not state in her opposition or amended complaint, or anywhere else that the Treasurer "denie[d] the claim finally" as required by the MTCA.  *See* Md. Code Ann., State Gov't § 12-106(b)(2).

Plaintiff attempts to salvage her claim by arguing that she had good cause to not comply with the MTCA.  After an amendment to the MTCA, claimants can now bring a tort claim against the State of Maryland without strictly complying with the MTCA notice requirements if they move the court to excuse their failure to notify and demonstrate good cause for that failure. *See Royster*, 154 F. Supp. 3d at 221.  Plaintiff did so move the Court (*see* ECF No. 19) but did not demonstrate good cause, and therefore her motion to excuse will be denied.  Essentially, "good cause" in this context exists if an ordinarily prudent person in the same circumstances would not have complied with the notice requirement.  *See Moore v. Norouzi*, 807 A.2d 632, 647 (Md. 2002) (discussing similar requirement in the Local Government Tort Claims Act).  Here, Plaintiff writes that "good cause can be shown insofar as Plaintiff was represented by counsel at the time the notice letter would have been due in May, 2016."  (*See* Mot. to Excuse 2, ECF No. 19)  This is a puzzling statement, but no matter how the Court reads it, whether Plaintiff did or did not have an attorney when she was originally harmed is of no moment.  *Cf. Bibum v. Prince George's County,* 85 F. Supp. 2d 557, 565 (D. Md. 2000) (ignorance of the law is not "good cause").

Finally, Plaintiff suggests that she substantially complied with the notice requirement. Regardless of whether or not a plaintiff had good cause for non-compliance, the notice requirements of the MTCA simply "do[] not apply if, within 1 year after the injury to person or property that is the basis of the claim, the State has actual or constructive notice of" the claimant's injury or the circumstances that gave rise to it. Md. Code Ann., State Gov't § 12-106(c)(2). Plaintiff did attach a letter (to her opposition) that she sent to the Treasurer on August 27, 2017, notifying the Treasurer of a claim. (Opp'n to State Mot. Dismiss Ex. H, ECF No. 30-8.) But this letter cannot save Plaintiff's action in this Court. First of all this letter is nowhere mentioned in Plaintiff's complaint or amended complaint. For that reason alone the Court would ignore it. *See Hansen v. City of Laurel*, 25 A.3d 122, 131 (Md. 2011) (stating that tort claimants must affirmatively plead satisfaction of a similar condition precedent for a Local Government Tort Claims Act notice requirement); *Piper v. Meade & Assocs., Inc.*, ___ F. Supp. 3d ___, Case No. RWT 17-cv-863, 2017 WL 4516698, at *3 (D. Md. Oct. 10, 2017) (stating that a court cannot consider "additional factual allegations in [a plaintiff's] Opposition . . . in its evaluation of the sufficiency of her pleadings.").

But even if the Court were to reach out and consider this letter, it does not put the State on notice of any claims that arose one year prior to the letter being sent. The "Date of Incident" listed in the letter is November 17, 2016, the date on which Plaintiff successfully argued for credentials for her Federal Government job at a Federal Government administrative hearing, during which a Federal Government lawyer failed to acknowledge certain documents. The State, according to this letter, Plaintiff's Amended Complaint, and the decision of the ALJ itself, did absolutely nothing to harm Plaintiff on November 17, 2016. (*See* Decision of ALJ, ECF No. 2-6.) The only other date mentioned in the letter on which Plaintiff's claim could have arisen is

March 21, 2016.[6]  Thus, in this letter, Plaintiff does not put the State on actual notice of any claims that had arisen within one year prior to her sending it.[7]  For these reasons Plaintiff did not comply with the MTCA, her motion to excuse failure to comply is denied, and, accordingly, her negligence claim against the State cannot proceed.

### ii.  *Contract*

The State has waived immunity for contract suits only where the claim is "based on a written contract."  Md. Code Ann., State Gov't § 12-201(a).  Furthermore, the claim must be filed within one year of the "later of:  (1) the date on which the claim arose; or (2) the completion of the contract that gives rise to the claim."  *Id.* § 12-202.  This requirement "is not a mere statute of limitations but sets forth a condition to the action itself."  *State v. Sharafeldin*, 854 A.2d 1208, 1219 (Md. 2004).

There is no alleged written contract.  Plaintiff alleges that she and the "State Defendants entered into a binding agreement (verbal or not)."  (Am. Compl. ¶ 58.)  Upon reading the amended complaint in its entirety, Plaintiff may be suggesting that the State somehow entered a non-verbal agreement, but there is no support in the amended complaint that it entered a written one.  On that basis alone the breach of contract claim against the State must be dismissed.

Furthermore, assuming there was a contract, it seems that this claim was brought more than one year after breach.  The only *possible* date provided by Plaintiff of an alleged breach

---

[6] Plaintiff concedes in the letter that March 21, 2016 is more than 1 year before this letter was sent but avers that the State had "actual and/or constructive notice" of the claim that (she contends) arose on that date because "detailed correspondence to the County Attorney . . . was sent on or about March 21, 2017."  Correspondence to a County Attorney does not put the State of Maryland on notice.

[7] As for constructive notice, the Court will reiterate, once again, that the Plaintiff did not allege in her amended complaint the dates on which her injuries arose or when the State would have had constructive notice (or why).  The Court can easily add that this August 27, 2017 letter does not appear to put the State on actual notice of a claim that arose within one year prior to Plaintiff sending it.  The Court cannot so easily dig through Plaintiff's many allegations and arguments to determine whether the State may have had some constructive notice of some injuries, and it declines to do so.

within one year of the commencement of this action is the date of the ALJ hearing on November 17, 2016. As mentioned above, the State Defendants did nothing on that date.

Plaintiff did not allege that the State entered into a written contract, or breached that contract within one year of the commencement of this action. Accordingly, Plaintiff has not presented alleged facts that would overcome the State's sovereign immunity – from the tort or contract claim – and the claims against the State will be dismissed.

### c. *Defendant Smith's Liability*

Plaintiff has brought three claims against Defendant Smith, one arising under Federal law and two arising under State law. The Court will address the Federal claim first.

### i. *Federal Claim – First Amendment retaliation*

Count one of Plaintiff's complaint alleges a violation of her First Amendment rights. This claim will be dismissed because Defendant Smith is entitled to qualified immunity. *See Edwards v. City of Goldsboro*, 178 F.3d 231, 250-51 (4th Cir. 1999).

Qualified immunity shields officials from Section 1983 actions when "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Edwards*, 178 F.3d at 250 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). First the Court must determine the alleged right that Plaintiff claims has been violated, and whether it is clearly established. *Id.* at 250-51. Then the Court will consider "whether a reasonable person in the official's position would have known that his conduct would violate that right." *Id.* at 251.

Plaintiff appears to bring a First Amendment retaliation claim, alleging that she had a right to send emails critical of Defendant Smith, and that he retaliated against her for doing so.[8]

---

[8] There is much under Count One that confuses the Court. First, Plaintiff titles this Count "42 U.S.C. § 1983 – First Amendment / Fourteenth Amendment / Article 40." (Am. Compl. p. 10.) It appears that Plaintiff is referring to

To determine whether Plaintiff had such a right, the Court will analyze this First Amendment retaliation claim under the "*McVey* test," which has three prongs. *See Adams v. Trustees of the Univ. of N.C.-Wilmington*, 640 F.3d 550, 560-61 (4th Cir. 2011) (quoting *McVey v. Stacy*, 157 F.3d 271, 277-78 (4th Cir. 1998)); *Edwards*, 178 F.3d at 251 (internal quotation marks and alterations omitted) ("In determining whether a right was clearly established . . . courts in this circuit ordinarily need not look beyond the decisions of the Supreme Court, this court of appeals, and the highest court of the state in which the case arose."). Under the *McVey* test, the Court must determine (1) whether Plaintiff's speech was protected under the First Amendment, (2) whether her interest in speaking outweighed her employer's interest in providing efficient services, and (3) whether her speech was the cause of the retaliation. *Adams*, 640 F.3d at 560-61. The Court will only focus on the first two prongs, because these are questions of law, and therefore "an employer is entitled to qualified immunity if either prong cannot be resolved under clearly established law." *Crouse v. Town of Moncks Corner*, 848 F.3d 576, 583 (4th Cir. 2017).

---

Article 40 of the Maryland Declaration of Rights, which is the Maryland state constitutional analogue of the First Amendment, but Section 1983 provides redress for persons when a state official violates a *Federal* right. *See Hodge v. Jones*, 31 F.3d 157, 167 (4th Cir. 1994). The Court need not dwell much on this oddity in Plaintiff's complaint, because even if the Court considered a separate claim for violation of the Maryland Declaration of Rights Plaintiff's claim would fail for the same reasons that her First Amendment retaliation claim fails (as described below). *See Freilich v. Upper Chesapeake Health, Inc.*, 313 F.3d 205, 213 n.2 (4th Cir. 2002) (quoting *Patterson v. Maryland*, 741 A.2d 1119, 1128 (Md. 1999) ("We construe 'guarantees in the Declaration of Rights to be in *pari materia* with similar provisions of the federal constitution.'"). Second, Plaintiff does not use the words "retaliate" or "retaliation" anywhere in her amended complaint, let alone under Count One, leaving the Court to guess at what type of First Amendment violation Plaintiff alleges occurred. She alleges that "Defendants' conduct [the two Defendants being Defendant Smith and the County] had the effect of chilling Plaintiff's right of free speech and expression," and that "[t]he Defendants' actions were not narrowly tailored to achieve a compelling state interest." (Am. Compl. ¶¶ 36, 38.) These allegations echo foundational elements of a more basic First Amendment claim – one that would allege that Defendant Smith engaged in some action or policy that prevented Plaintiff from engaging in protected speech – but that does not appear to be Plaintiff's goal. Given the substance of paragraphs 34 and 35 (outlining what protected speech Plaintiff allegedly engaged in and the actions that Defendants took in response) and her allegations that she suffered financial harm because she resigned, the Court assumes that Plaintiff has brought a First Amendment retaliation claim. What's more, the State assumes the same. (*See* State Mot. Dismiss Mem. Supp. 1, ECF No. 25-1 ("[Plaintiff alleges] that the defendants violated her First Amendment rights by retaliating against her."); *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (omission in the original) (quoting *Twombly*, 550 U.S. at 555) ("[T]he statement need only 'give the defendant fair notice of what the . . . claim is.'").

The first questions, then, are what speech did Plaintiff engage in, and was it protected? As best the Court can tell, Plaintiff's speech that resulted in retaliation against her was that contained in emails she sent at some point in 2014 or later to some person. (Am. Compl. ¶ 34 ("[T]he true underlying nature of the souring of Plaintiff's relationship with the State Defendants and her initial termination was the disparaging email correspondence from Plaintiff.").)[9] Plaintiff alleges that these emails contained speech on two topics. (*See id.* ¶¶ 11-12.) First, Plaintiff's emails "contained some employee frustration and disparaging comments about Defendant Smith in his capacity as State's Attorney." (*Id.* ¶ 12.) Second, Plaintiff discussed her frustration with Defendant Smith's religious views and their interference with her work. (*Id.* ¶ 11.)

Speech regarding the first topic is not protected by the First Amendment. This speech is among the "infinitude of worker dissatisfactions with supervisors" that the Court should not "elevate . . . to a constitutional plane." *Brooks v. Arthur*, 685 F.3d 367, 373 (4th Cir. 2012); *see also Huang v. Bd. of Governors of the Univ. of N. Carolina*, 902 F.2d 1134, 1140 (4th Cir. 1990) ("A public employee's expression of grievances concerning his own employment is not a matter of public concern.").

Protection (or not) of the speech regarding Defendant Smith's religious views presents a closer question. Although it seems that these statements were made to a coworker, or at least not disseminated to the public, "[e]mployees . . . may receive First Amendment protection for expressions made at work." *See Garcetti v. Ceballos*, 547 U.S. 410, 420 (2006) (citing *Givhan v.*

---

[9] To the extent Plaintiff believes she was retaliated against for supporting Rolle in an election, she has failed to sufficiently allege as much, and furthermore that speech occurred in 2014. Plaintiff does not allege that Defendant Smith explicitly fired her for this support (and she does not allege that Rolle is mentioned in her emails). Therefore, insofar as this is a basis for Plaintiff's First Amendment retaliation claim she would seem to allege that the nexus between her speech and her termination was proximity alone (i.e., she supported Rolle in an election and was subsequently fired). "Where a plaintiff rests his case on temporal proximity alone, the temporal proximity must be very close." *Penley v. McDowell Cty. Bd. of Educ.*, 876 F.3d 646, 656 (4th Cir. 2017). Three years is not "very close."

*Western Line Consol. Sch. Dist.*, 439 U.S. 410, 414 (1979)).  Still, the State argues that this speech deserves no First Amendment protection because it was made "entirely pursuant to her job duties."  (*See* State Mot. Dismiss Mem. Supp. 11, ECF No. 25-1 (citing *Garcetti*, 547 U.S. at 421).)  It would be rather odd, however, if Plaintiff's duties as a Victim-Witness Coordinator involved surreptitiously griping about her supervisor's religious views.  Further, if the Court infers that Plaintiff was stating that Defendant Smith, a State's Attorney, was unfairly treating a victim because of his own views on abortion, then "a member of the community [would likely] be truly concerned with the employee's speech," thus suggesting it is a matter of public concern that  deserves constitutional protection.  *Goldstein v. Chestnut Ridge Volunteer Fire Co.*, 218 F.3d 337, 353 (4th Cir. 2000).  However, the Court should, to some extent, consider the *purpose* behind a person's speech.  *See Connick v. Myers*, 461 U.S. 138, 148 (1983).  And it does not seem that Plaintiff was "seek[ing] to bring to light actual or potential wrongdoing or [a] breach of public trust" so much as she was simply venting to a coworker.  *Id.*  The Court declines to resolve this close question, as the dispositive fact is simply that the question *is* close.  This first "prong cannot be resolved under clearly established law" and therefore Defendant Smith is entitled to qualified immunity from Plaintiff's Section 1983 claim.  *Crouse*, 848 F.3d at 583.

The Court will briefly consider the second prong of the *McVey* test, and in doing so concludes that it too cannot be resolved in Plaintiff's favor, and in fact tips towards the Defendant.  The second prong of the *McVey* test invites the Court to engage in *Pickering* balancing, so named for *Pickering v. Board of Education*, 391 U.S. 563 (1968).  Under *Pickering*, this Court balances the interests of the Plaintiff in being free to speak her mind against the interests of the employer in "being able by appropriate disciplinary action to avoid disruption of its internal operations."  *Berger v. Battaglia*, 779 F.2d 992, 997 (4th Cir. 1985).  On the

employee side of the scale is the "employee's interest in speaking on matters of public concern," *McVey*, 157 F.3d at 278, as well as the "public's interest in hearing the employee's speech," *Brickey v. Hall*, 828 F.3d 298, 304 (4th Cir. 2016). So, while a public-employee's choice of forum is not dispositive for the question of whether the speech is protected, it is consequential in this *Pickering* balancing. *Crouse*, 848 F.3d at 585 (noting that the plaintiffs' speech "was simply not an effort to participate in a larger public dialogue"). On the employer side of the scale is the public's interest in the efficient operation of public agencies, "the extent to which [the plaintiff's speech] disrupts the operation and mission of the agency," *McVey*, 157 F.3d at 278, or whether the speech "interfered with and impaired . . . operations and discipline as well as working relationships," *Grutzmacher v. Howard Cty.*, 851 F.3d 332, 345 (4th Cir. 2017).

On the employee side of the scale, Plaintiff's case is weak. As discussed above, her speech does not appear to have been designed to inform the public or expose improper practices. It appears to have been a venting email to a coworker. The employer side of the *Pickering* scale has more weight. Plaintiff was caught speaking ill of her supervisor behind his back, "expressly disrespect[ing] [her] superior[]," *LeFande v. District of Columbia*, 841 F.3d 485, 495 (D.C. Cir. 2016), and interfering with a working relationship that became so impaired that she could no longer work at the SAO. For these reasons, the Court finds Defendant Smith's interest in maintaining an efficient workplace and preventing disruption likely outweighed Plaintiff's interest in speaking in the manner that she did. *See Grutzmacher*, 851 F.3d at 345. Even if it did not, Defendant Smith's actions did not violate a clearly established constitutional right, and thus he is entitled to qualified immunity.

By way of a coda, the Court will "lastly consider whether a reasonable person in the official's position would have known that his conduct would violate [this] right." *Edwards*, 178

F.3d at 251. A reasonable person in Defendant Smith's position would not have known that asking Plaintiff for her resignation in light of her disparaging emails violated her constitutional right to engage in First Amendment protected speech (if it violated that right at all).

The Court cannot, under clearly established law, resolve the question of whether Plaintiff's speech was protected, and finds that Plaintiff's interest in speaking was likely outweighed by her employer's interest in maintaining efficient operations. Finally, a reasonable person in Defendant Smith's position would not have known that he was violating Plaintiff's First Amendment rights. For these reasons, the Court will dismiss Count One against Defendant Smith because he is protected by qualified immunity.

### ii. *State Claims*

Plaintiff has brought two state law claims against Defendant Smith. Count Three is, essentially, a negligence claim, and Count Four is a breach of contract claim. The Court will discuss them in that order.

### 1. *Negligence*

Count Three purports to state a claim for "Malice / Gross Negligence/ Abusive Discharge [sic]." (Am. Compl. p. 15.) Plaintiff appears to bring a negligence claim, as the allegations under Count Three proceed in the standard negligence fashion, stating a duty, a breach, and damages. This negligence claim will be dismissed because Plaintiff has failed to allege malice or gross negligence necessary to overcome qualified immunity for employers or for state personnel under Maryland law.

Under Maryland law, "[a]n employer acting in good faith may not be held liable for disclosing information" to a prospective employer or the federal government relating to "the reason for [an employee's] termination of employment." Md. Code Ann., Cts. & Jud. Proc. § 5-

423(a).  An employer is presumed to be acting in good faith unless it is shown that the employer acted with malice or gross negligence.  *Id.* § 5-423(b).  Similarly, state personnel are immune from tort liability for acts within the scope of their public duties, unless they act with malice or gross negligence.  *Id.* § 5-522.  Simply stating that a defendant has acted with "malice" or "gross negligence" will not overcome these hurdles.  *See Baltimore Police Dep't v. Cherkes*, 780 A.2d 410, 438 (Md. Ct. Spec. App. 2001) ("A conclusory allegation that a public official acted 'maliciously,' . . . is insufficient."); *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555) ("A pleading that offers 'labels and conclusions' . . . will not do.").

As alleged, Defendant Smith's actions amount to, at worst, some discourtesy; not gross negligence or malice.  Defendant Smith, after an investigation, accused Plaintiff of misuse of certain databases and then retracted that accusation – both in his "reconsideration" of his decision to fire Plaintiff, and in an email to Plaintiff's current employer.  Additionally he, or someone who works at the SAO, truthfully answered a federal questionnaire which asked whether Plaintiff had resigned by mutual agreement due to specific problems.  The Court struggles to determine what duty Defendant Smith allegedly breached, or find any negligence whatsoever, and cannot find gross negligence on these facts.  Neither does it find that Plaintiff sufficiently alleged malice.  Accordingly, Plaintiff has not pled facts which defeat Defendant Smith's immunity as an employer or as a state official.

Plaintiff seems to slip in a claim of "abusive discharge" in Count Three.  In addition to the reference to "abusive discharge" in the title of this Count, Plaintiff alleges that "[t]he motivation behind Defendant Smith's gross negligence was in direct contravention to a clear mandate of public policy."  (Am. Compl. ¶ 54.)  This statement has the flavor of an abusive discharge claim.  *See Yuan v. Johns Hopkins Univ.*, 157 A.3d 254, 262 (Md. 2017) (quoting

*Wholey v. Sears Roebuck*, 803 A.2d 482, 489 (Md. 2002) (stating the elements of a wrongful termination claim, including that "the basis for the employee's discharge must violate some clear mandate of public policy").   But a flavor is not sufficient to state a claim.   To state a claim for abusive discharge, an employee must allege (1) that they have been discharged, (2) that "the basis for the employee's discharge must violate some clear mandate of public policy," and (3) "there must be a nexus between the employee's conduct and the employer's decision to fire the employee."   *Id.* (quoting *Wholey*, 803 A.2d at 489).

The only paragraph of Plaintiff's complaint that even suggests a claim for abusive discharge reads as follows:

> The motivation behind Defendant Smith's gross negligence was in direct contravention to a clear mandate of public policy insofar as the inaccurate allegations made against Plaintiff were pretextual in nature and made to hide that the true reason Defendant Smith sought to terminate Plaintiff from employment was due to the State's Attorney becoming privy to an exercise in constitutionally protected free speech by Plaintiff which was viewed as derogatory in nature to Defendant State by Defendant Smith.

(Am. Compl. ¶ 54.)   This byzantine paragraph-sentence fails under Federal Rule of Civil Procedure 8 (at least).   It does not provide a short and plain statement of an abusive discharge claim.   Furthermore, to the extent Plaintiff alleges that Defendant Smith violated a "clear mandate of public policy" by firing Plaintiff for her emails, the Court has already explained that this was not violative of Plaintiff's First Amendment rights, and thus can see no reason why it would be a violation of public policy, let alone a "clear mandate of public policy."   Thus, to the extent Plaintiff brought an abusive discharge claim, it fails under both Rule 8 and Rule 12(b)(6).[10]

---

[10] Defendant Smith is also entitled to state personnel immunity from this claim because, again, Plaintiff has not sufficiently alleged malice or gross negligence.

## 2. *Breach of Contract*

Finally, Plaintiff purports to bring a breach of contract claim against Defendant Smith in his individual capacity. The State attempts to sweep this final claim under the rug, asserting at the end of its memorandum that "Ms. Littleton makes no allegation that any alleged contract was formed between her and State's Attorney Smith in his individual capacity." (State Mot. Dismiss Mem. Supp. at 21.) The Court sympathizes with the State on account of Plaintiff's complaint being rather confusing, but Count Four is relatively clear. It reads, in part, "Plaintiff and the State Defendants entered into a binding agreement." (Am. Compl. ¶ 58.) On the first page of the amended complaint, Plaintiff defines the State of Maryland and J. Charles Smith III as, "collectively 'State Defendants.'" (*Id.* at p. 1.) The State further misreads Plaintiff's amended complaint when it writes that, "[Plaintiff] alleges that her contract was between her and her 'employers.'" (State Mot. Dismiss Mem. Supp. at 21 (citing Am. Compl. ¶ 58).) Plaintiff alleges that the contract is between her and the "State Defendants" (which includes Defendant Smith), and that a *condition* of satisfaction of the contract is ensuring "that no future employers are aware of [inaccuracies in the May 26 letter]." (*Id.* ¶ 58 (emphasis added).) That is, the alleged contract is, in part, *about* "employers," but it is *between* Plaintiff and Defendant Smith (and the State). So, Plaintiff *does* plead that she formed a contract with Defendant Smith. Furthermore, there are no other adequate reasons for dismissal provided by the State.

The State argues that the contract is void under the Statute of Frauds' "one year provision" because the contract was formed in May of 2015 and performance was not completed by May 2016. (*See* State Mot. Dismiss Mem. Supp. at 8.) The State misunderstands the Statute of Frauds. *See* Md. Code Ann., Cts. & Jud. Proc. § 5-901. "Maryland courts have strictly

applied the 'one year' provision of the Statute of Frauds, whereby 'the statute will not apply where the contract can, by any possibility, be fulfilled or completed in the space of a year.'" *Pitman v. Aran*, 935 F. Supp. 637, 648 (D. Md. 1996) (alterations omitted) (quoting *Chesapeake Fin. Corp. v. Laird*, 425 A.2d 1348, 1351 (Md. 1981)).  It is entirely possible that this contract could have been satisfied within a year.[11]  Therefore, the Statute of Frauds does not prevent Plaintiff from bringing this action.

The State seems to suggest that Defendant Smith would be immune from contract liability due to state personnel immunity.  (*See* State Mot. Dismiss Mem. Supp. at 21); Md. Code Ann., Cts. & Jud. Proc. § 5-522.  The State writes that Plaintiff "alleges that any potential contract was formed in [Defendant Smith's] role as employer of staff at the State's Attorney's Office, which is a duty assigned to State's Attorney Smith by statute."  (State Mot. Dismiss Mem. Supp. at 21.)  State personnel immunity shields state officials from *tort* liability when they "act within the scope of [their] public duties," but the statute does not shield state personnel from *contract* liability.  Md. Code Ann., Cts. & Jud. Proc. § 5-522.[12]

In the end, Plaintiff has alleged that she and "the State Defendants," including Defendant Smith, "entered into a binding agreement" and that "the Defendants" breached that agreement.  (Am. Compl. ¶¶ 58, 60.)  The State has put forth no satisfactory reason why this claim should not proceed.

---

[11] Plaintiff could have resigned immediately (as she did), the SAO could have provided a letter of recommendation within a year (which they did), the SAO could have "sanitize[d] [Plaintiff's] personnel file of all accusations regarding impropriety" within a year, and *could* have "ensur[ed] that no future employers are aware of those inaccurate accusations contained in [the May 26] letter" within a year if, for example, Plaintiff had died in the following year and therefore had no future employers.

[12] The State does not suggest that Defendant Smith is immune from this contract claim under employer immunity, so the Court will assume that Defendant Smith waived that immunity for this claim.  Even if he did not waive, it appears that employer immunity would not protect Defendant Smith from an allegation that he breached a contract the terms of which governed what information he could provide to a prospective employer.

### IV. *Conclusion*

The County did not perform any actions that can serve as the basis for liability and therefore Plaintiff's claims against the County will be dismissed. Plaintiff's claims against the State will be dismissed because Plaintiff has failed to satisfy the conditions necessary for the State to consent to suit. Plaintiff's First Amendment retaliation claim against Defendant Smith will be dismissed because Defendant Smith is entitled to qualified immunity. Plaintiff's negligence claim in Count Three is dismissed because Defendant Smith is entitled to employer immunity and state personnel immunity. Plaintiff failed under Rule 8 and 12(b)(6) to state a claim against Defendant Smith for abusive discharge, and furthermore Defendant Smith is entitled to state personnel immunity from that claim as well. Accordingly, all Counts in Plaintiff's amended complaint will be dismissed against all Defendants with the exception that Count Four (breach of contract) will proceed against Defendant Smith only. Plaintiff failed to demonstrate good cause for failure to satisfy the notice conditions of the MTCA, and therefore her motion to excuse failure to notify will be denied. An order shall issue accompanying this memorandum and setting forth this disposition.

DATED this 28th day of February, 2018.

BY THE COURT:


_____/s/_____
James K. Bredar
Chief Judge
